IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

Brian Mann, et al.,          :

    Plaintiffs,          :

  v.                         :   Case No. 2:00-cv-0706

Reginald Wilkinson, et al.,  :   JUDGE FROST

    Defendants.          :

OPINION AND ORDER

    Plaintiff, Brian Mann, a state prisoner, filed this action raising constitutionally based claims concerning his right to practice his religion of choice while confined in a state prison. As a result of various developments in the case, there are only two claims remaining for decision by the Court. One involves Mr. Mann's request that he be permitted to attend group worship services with others who share his religious beliefs. The second relates to his request to receive and possess a copy of a pamphlet explaining the belief system of the Christian Identity Church. The defendants have moved for summary judgment on both claims. For the following reasons, the motion will be granted as to the first claim and denied as to the second.

I.

    Summary judgment is not a substitute for a trial when facts material to the Court's ultimate resolution of the case are in dispute. It may be rendered only when appropriate evidentiary materials, as described in Fed. R. Civ. P. 56(c), demonstrate the absence of a material factual dispute and the moving party is entitled to judgment as a matter of law. <u>Poller v. Columbia Broadcasting Systems, Inc.</u>, 368 U.S. 464 (1962). The moving party bears the burden of demonstrating

that no material facts are in dispute, and the evidence submitted must be viewed in the light most favorable to the nonmoving party. Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970). Additionally, the Court must draw all reasonable inferences from that evidence in favor of the nonmoving party. United States v. Diebold, Inc., 369 U.S. 654 (1962). The nonmoving party does have the burden, however, after completion of sufficient discovery, to submit evidence in support of any material element of a claim or defense on which that party would bear the burden of proof at trial, even if the moving party has not submitted evidence to negate the existence of that material fact. See Celotex Corp. v. Catrett, 477 U.S. 317 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986). Of course, because "a party seeking summary judgment ... bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact," Celotex, 477 U.S. at 323, the responding party is only required to respond to those issues clearly identified by the moving party as being subject to the motion. It is with these standards in mind that the instant motion must be decided.

                                II.

Both parties have submitted affidavits in connection with the summary judgment proceedings. The Court will summarize the facts contained in those affidavits as they relate to each of Mr. Mann's two claims for relief.

Mr. Mann is a member of a Christian Identity Church. The Court will summarize the belief system of that church later in this opinion. Generally, however, the Christian Identity Church believes that the teachings of the Bible are intended for the White race only and that any mixing of the races is contrary to

God's intent.  Mr. Mann is confined at the Southern Ohio Correctional Facility in Lucasville, Ohio.  At some point, he requested that group worship services be permitted for himself and other members of the Christian Identity Church.  Other religious groups - Protestants, Catholics, Jehovah's Witnesses and Muslims - are permitted to attend group worship services at the SOCF.

In order to determine whether Christian Identity adherents could reasonably be accommodated by allowing them to attend one of these congregate worship services, prison officials requested information concerning the core beliefs of the Christian Identity Church.  Mr. Mann submitted a pamphlet from the Christian Identity Church including that church's "Doctrinal Statement of Beliefs."  Donald York, who works as a Chaplain at the SOCF, reviewed this pamphlet and concluded that there are a number of common beliefs shared by Protestants and members of the Christian Identity Church.  According to his affidavit, "the Protestant religious service at SOCF encompasses the elements that the Christian Identity sect shares in common with the rest of Protestantism" and "the content of the Protestant religious service at SOCF would not be offensive to members of the Christian Identity sect."  Because Mr. Mann could be accommodated by attending this service, and because there were other reasons which, in the eyes of prison officials, justified declining to provide a separate worship service to Christian Identity members, Mr. Mann's request was denied.

Mr. Mann's religious literature claim arises from the fact that prison officials, after reviewing the doctrinal pamphlet he provided to them, refused to return it to him.  A copy of that pamphlet has been submitted into court as part of document #131.  According to a memorandum prepared by Gary Sims, the religious services administrator at SOCF, the pamphlet was not returned to

Mr. Mann "because of the racist content."  Although much of the pamphlet consists of a statement of beliefs supported by reference to passages contained in the Old and New Testaments, there are certain statements which can readily be described as racist.  For example, one of the beliefs of the Christian Identity Church is that "the White Anglo-Saxon, Germanic and kindred people [are] God's true, literal Children of Israel"  and that this group of people "stands far superior to all other peoples in their call as God's servant race...."  The pamphlet describes Jews as "children of Satan" and "a race of vipers....[and] anti-Christs...."  Adherents of Christian Identity believe that the White race is "called to come out and be a separated people," a calling which "includes segregation from all non-white races...."  The pamphlet describes "race-mixing" as "an abomination in the sight of Almighty God...."  The pamphlet also describes homosexuality as "an abomination before God" which "should be punished by death."

     The decisions to deny Mr. Mann's request for congregate worship services for the Christian Identity Church and to possess a copy of the pamphlet in question were not made in a vacuum.  SOCF is a maximum security prison.  On April 11, 1993, the worst prison riot in Ohio history began at that institution.  It is generally believed that the desire for racial separation was one of the contributing factors to the riot.  Additionally, some of the riot planning took place during congregate worship services.  According to the declaration of Edwin C. Voorhies, Jr., the Warden at SOCF, "publications advocating racism or hatred of any particular race pose a high risk to the safety and security of inmates and staff...at SOCF."  Nevertheless, Warden Voorhies also declares that there is no *per se* ban on such publications, but that prison officials restrict them more severely at SOCF than at other institutions with lower security levels or which lack the

history of racial violence that is present at SOCF.  In his declaration, Warden Voorhies also states that the one reference to homosexuality in the Christian Identity pamphlet is a threat to the safety of the institution because there are homosexual inmates there and they are generally at a higher risk of assault than heterosexual inmates.  Finally, Warden Voorhies details certain logistical and security concerns which are implicated by providing congregational worship to prisoners and states that such services are therefore limited to those religions providing a broad experience to a variety of inmates.  It is with these facts in mind that the pending summary judgment motion will be decided.

### III.

Since the passage of the Religious Land Use and Institutionalized Persons Act (RLUIPA), a civil action filed by a state prisoner who claims that his or her right to the free exercise of religion has been infringed upon by prison officials is governed by RLUIPA's statutory standard.  Under RLUIPA, 42 U.S.C. §2000cc-1, "[n]o government shall impose a substantial burden on the religious exercise of a person...confined to an institution" unless the government can demonstrate that the burden furthers a compelling governmental interest and is the least restrictive means available to further that interest.  Under RLUIPA, any religious practice in which an institutionalized person wishes to engage need not be compelled by his or her religion, or be a central tenet of that religion, in order for RLUIPA's strictures to apply.  42 U.S.C. §2000cc-5(7)(A).

In many cases filed under RLUIPA, the Court's focus will be upon whether the government restriction or burden on religion both furthers some compelling governmental interest and is the least restrictive means to do so.  However, the plaintiff in a

RLUIPA action also has an obligation to prove not just that some government regulation or ruling restricts religious exercise but, in the language of the statute, imposes "a substantial burden" on that exercise.  Thus, RLUIPA really entails a two-part inquiry, and the first part of the inquiry focuses upon the extent to which the institutionalized person's right to the free exercise of a religion of his or her choice is burdened by the governmental action at issue.

     Although the Court of Appeals for the Sixth Circuit has addressed various aspects of RLUIPA, see, e.g., Hoevenaar v. Lazaroff, 422 F.3d 366 (6th Cir. 2005), it does not appear to have defined with precision what is meant by the term "substantial burden" on religious exercise.  Other courts of appeals have addressed the issue, however, and appear to have arrived at a common understanding of the term.  Thus, for example, in Lovelace v. Lee, 472 F.3d 174, 187 (4th Cir. 2006), the court, quoting Thomas v. Review Board of Ind. Employment Sec. Div., 450 U.S. 707, 718 (1981), concluded that a substantial burden on the exercise of religion exists whenever a government action or regulation puts "substantial pressure on an adherent to modify his behavior and violate his beliefs."  Put another way, if a religious adherent is punished as a result of exercising his or her religion, or is threatened with punishment in order to cause that person to forego practicing his or her religion, a substantial burden on religion has been imposed.  Warsoldier v. Woodford, 418 F.3d 989, 996 (9th Cir. 2005).  Thus, the first questions the Court must address with respect to Mr. Mann's two claims are whether the actions of prison officials in either denying him the opportunity to participate in congregate worship services with only members of the Christian Identity Church substantially burdens his exercise of that religion, and whether its refusal to allow him to possess a pamphlet setting forth the

basic tenets of that religion poses a similar substantial burden. The Court will examine the rationale for those decisions in light of RLUIPA only if Mr. Mann succeeds in demonstrating that, at a minimum, material factual issues exist about whether the actions of the defendants imposed a substantial burden on his religious exercise.

### A. Congregate Worship Services

"The State does not have an affirmative duty to provide every prison inmate with...the [religious] service of his choice...." Small v. Lehman, 98 F.3d 762, 767 (3d Cir. 1996), overruled on other grounds by Boerne v. Flores, 521 U.S. 507 (1997). However, the State may not simply deny a substantial number of inmates the right to worship collectively, especially if their practice of their religion would be significantly inhibited by doing so. In other words, "an opportunity to worship as a congregation by a substantial number of prisoners may be a basic religious experience...." Id. Depending upon the circumstances, such a basic religious experience may or may not be accommodated by permitting adherents of one religion to attend congregate worship services conducted by those who profess a different religion but have similar beliefs. Requiring an inmate to worship with "someone whose beliefs are significantly different from or obnoxious to" the beliefs of plaintiff may be a substantial burden on religion. Id.

Consistent with RLUIPA, the Court is not called upon to determine whether congregate worship is compelled by or a central tenet of the belief system of the Christian Identity Church. On the other hand, the importance of congregate worship to members of the church is a factor to be taken into account in determining whether the denial of congregate worship, or at least congregate worship by members of that church alone without the participation of others with a similar set of core beliefs, is a substantial

burden on Mr. Mann's ability to practice the Christian Identity religion.  See, e.g., Murphy v. Missouri Dep't. of Corr., 506 F.3d 1111 (8th Cir. 2007).

Mr. Mann's primary argument is that his need for congregate worship would not be satisfied by attending general Protestant services because, although Christian Identity believers and mainstream Protestants may base their religious beliefs on the same text, they interpret that text so differently that there would be aspects of Protestant worship which would be offensive to Christian Identity believers.  In particular, members of minority groups and homosexuals may attend and participate in Protestant worship.  Simply worshiping with these individuals would, according to Mr. Mann, prevent him from having an appropriate worship experience.  A similar argument concerning the Christian Separatist Church, which appears to have beliefs similar to those of the Christian Identity Church, has been found by at least one court to present a material factual question about whether worshiping with mainstream Protestants would substantially burden members of a racially-separatist church. See Murphy v. Missouri Dep't. of Corr., 372 F.3d 979 (8th Cir. 2004).

The Court concludes that, on this record, Mr. Mann has not made an adequate showing that denying him the opportunity to attend separate Christian Identity worship services substantially burdens his exercise of that religion.  The primary basis for this conclusion is that Mr. Mann has not identified any other members of that church who are imprisoned at the SOCF and who would attend such a congregate worship service.  Further, he has not explained how congregate worship services are either required by his religion or would substantially further his exercise of that religion beyond those things already permitted to him.  He is allowed to have a copy of the Bible and he can be visited by

clergy of the Christian Identity Church who can lead him in individual worship and study.  Under these circumstances, the Court cannot conclude that there are material factual issues surrounding whether the denial of group worship services represents a substantial burden on Mr. Mann's ability to practice his chosen religion.

### B. Religious Literature

The question about whether Mr. Mann is permitted to possess the pamphlet in question which sets forth the basic doctrines of the Christian Identity Church presents different issues.  First, because the pamphlet sets forth the core beliefs of the religion, preventing Mr. Mann from possessing this document at least arguably poses a substantial burden on his exercise of his chosen religion.  It would be difficult to assert, for example, that a Lutheran could easily practice his or her religion even though he or she were prohibited from reading or possessing a copy of the Augsberg Confession, or that a Catholic would not be substantially burdened if he or she were denied access to Papal encyclicals.  Thus, the questions with respect to the pamphlet are whether there is a compelling state interest in prohibiting Mr. Mann from possessing this pamphlet, and whether the outright ban on its possession is the least restrictive means available to the State to further that interest.

The Court begins its analysis by echoing another court's observation about the difficult nature of the issues posed to prison officials when they receive a request for religious expression which implicates prison security concerns.  "Anyone familiar with prisons understands the seriousness of the problems caused by prison gangs that are fueled by actively virulent racism and religious bigotry.  Protecting staff from prisoners and prisoners from each other is a constant challenge."  Stefanow v. McFadden, 103 F.3d 1466, 1472 (9th Cir. 1996), recognized as

superseded by statute on other grounds in Navajo Nation v. U.S. Forest Serv., 479 F. 3d 1024 (9th Cir. 2007).  Nevertheless, it is inconsistent with both the letter and spirit of RLUIPA (or its precedessor, the Religious Freedom Restoration Act) to permit concerns about prison security to trump every request by a prison inmate to receive or view religious literature that has racist or homophobic overtones.  Rather, if publications which are genuinely religious in nature do "not counsel violence [and] there is no evidence that they have ever caused a disruption" in the prison setting, the fact that "the views expressed in the publications are racist and separatist" cannot by itself justify an absolute ban on such publications.  Williams v. Brimeyer, 116 F.3d 351, 354 (8th Cir. 1997).  An absolute ban on religious publications should ordinarily be limited to those which "promote violence to exalt the status of whites and demean other races...."  Borzych v. Frank, 439 F.3d 388, 391 (7th Cir. 2006).

 In this case, the defendants have attempted to justify their ban on the Christian Identity pamphlet because it is racist, and because there is a history of racial violence within the SOCF. However, they have provided no proof that such racial violence was connected in any way to White separatist religious groups such as the Christian Identity Church, the Christian Separatist Church, or the Church of Jesus Christ Christian, all of which appear to have similar beliefs concerning the biblical supremacy of the White race.  They have similarly provided no evidence from which the trier of fact could conclude that literature relating to such separatists groups has itself been a cause of violence within the SOCF or any other institution or that such literature has been used to promote membership in racially-segregated gangs which, in turn, may have been responsible for acts of violence within any Ohio prison.  At least one court has concluded that the absence of such facts precludes an entry of summary judgment

in favor of prison officials under very similar circumstances: "[S]ummary judgment would be appropriate only if [the defendants] presented some specific evidence, why this particular item implicates prison concerns." Murphy v. Missouri Dep't. of Corr., 372 F.3d 979, 986 (8th Cir. 2004).

Most courts have analyzed this issue in terms of whether prison officials are able to demonstrate, in a fashion not reasonably subject to dispute, that a particular piece of literature advocates not only separation of the races or supremacy of one race over another, but also violent acts in order to promote a racially separatist agenda.  As the court in McCabe v. Arave, 827 F.2d 634, 638 (9th Cir. 1987) pointed out, "literature advocating racial purity, but not advocating violence or illegal activity as a means of achieving this goal, and not so racially inflammatory as to be reasonably likely to cause violence at the prison, cannot be constitutionally banned...." That case, decided well before the enactment of either RLUIPA or RFRA, noted that "[c]ourts have repeatedly held that prisons may not ban all religious literature that reflects racism." Id.  In fact, even under the more lenient standard followed by federal courts after the Supreme Court's Turner v. Safley decision (see 482 U.S. 78 (1987)), courts have struck down bans on separatist literature such as that put out by the Church of Jesus Christ Christian.  See Nichols v. Nix, 810 F.Supp. 1448 (S.D. Iowa 1993).  Obviously, if a prison cannot justify such a ban under the more lenient Turner standard, which requires only that the ban reasonably be related to a legitimate penological interest, such a ban could not withstand scrutiny under RLUIPA.

Here, the Court concludes that the reasons given by the defendants in their declarations and affidavits are simply too conclusory to require a finding that, as a matter of law, the prison's undoubtedly compelling interest in security can be

furthered only by a complete ban on this particular piece of religious literature.  Any literature advocating separation of the races with supremacy of one race over another has the potential to be inflammatory.  In certain situations, even a publication which does not advocate the use of violence in order to achieve racial supremacy might be so inflammatory as to justify a ban.  For example, if there were a large number of adherents of a particular separatist religion in one prison, and evidence was gathered that such a group used the racial statements in religious literature to incite members to individual or collective acts of violence, or even to gang membership which poses an increased risk of violence, a ban or other restriction might be the least restrictive means available to prison authorities to prevent such violence.  Here, however, the evidence suggests that Mr. Mann may be the only adherent of the Christian Identity Church at SOCF.  There is no evidence that he ever used the religious literature in question (which he possessed for some time before turning it over to prison authorities) to incite or promote acts of violence or to enlist prisoners in a gang.  Consequently, there is a genuine factual question concerning whether this literature is capable of such use.  Certainly, it is not as inflammatory as a book like *Christianities Ancient Enemies*, which contains a call to the White race to take up arms in order to win a war of survival against other races, so that it can legitimately be banned without further evidence as to the potential misuse of such literature.  Cf. Stefanow v. McFadden, supra.

    The defendants have also argued that because the pamphlet in question contains a single statement about homosexuality being an abomination punishable by death, it should be banned for that reason.  Again, it is a matter of common knowledge that homosexual prisoners may be more susceptible to acts of violence

12

than heterosexual prisoners, and the defendants' factual submissions support that conclusion.  On the other hand, the literature in question does not appear to advocate that a Christian Identity adherent himself or herself kill homosexuals. Rather, it simply makes reference to a passage from the Book of Leviticus which, indeed, suggests that homosexuality (along with many other types of behavior) should be punishable by death. There is room to debate whether this statement might be used to promote violence against homosexuals, but there would also be room to debate whether similar biblical statements about the death penalty being appropriate for murderers or adulterers could be used to promote individual acts of vengeance against such persons.  Presumably, many prisons, including the SOCF, are populated by both murderers and adulterers.  The statement may simply represent a moral belief that the appropriate societal penalty for such behavior is death.  Further, the memorandum which was written when Mr. Mann's pamphlet was confiscated did not cite this passage as a basis for the ban, but rather referred exclusively to the racist nature of the publication.  Finally, prison officials have not shown that some redaction of this particular pamphlet with respect to its isolated reference to homosexuality would not be a viable alternative to banning the publication altogether.  Consequently, there are a myriad of factual disputes about whether the total ban on this particular pamphlet is consistent with RLUIPA.  Thus, summary judgment is not appropriate on this claim.

IV.

The defendants have also raised the defense of qualified immunity.  Because summary judgment will be granted on the claim relating to congregate religious services, the Court need not reach the qualified immunity question as it relates to that issue.  Further, to the extent that Mr. Mann seeks prospective

injunctive relief concerning his religious pamphlet, qualified immunity is not a defense.  Finally, the law relating to the exclusion of religiously oriented but recently separatist literature is sufficiently well developed that a reasonable prison official would realize, at least by 2006, that unless there was an articulable basis for concluding that a particular piece of religious literature was not merely racist but also either advocated some type of violence, or would likely be used in the prison setting for violent purposes, it could not be banned.  As to these defendants (to the extent that they are potentially liable for damages, a question which is not directly presented here because the level of their personal involvement in the specific deprivation has not been made clear in their motion for summary judgment), their entitlement to qualified immunity is directly tied to the factual dispute about whether and to what extent officials at the SOCF in 2006 were aware of facts which would suggest that by giving this pamphlet back to Mr. Mann, an unacceptable risk of violence against either non-white inmates or homosexual inmates would be created.  This type of factual dispute, coupled with the law establishing that there must be at least some evidence of specific rather than general threats of violence posed by racially separatist literature, prevents the Court from granting summary judgment to the defendants on the damage claim on grounds of qualified immunity.  This ruling does not, of course, prevent the two main defendants, both of whom are retired and neither of whom appears to be directly involved in the deprivation complained about by Mr. Mann, from defending the damages claim on other grounds.

V.

Based upon foregoing, the defendants' motion for summary judgment (#131) is GRANTED IN PART and DENIED IN PART.  Mr. Mann's claims concerning congregate worship services are

DISMISSED.  However, there is a triable issue of fact with respect to his claim concerning religious literature.

/s/ Gregory L. Frost
GREGORY L. FROST
UNITED STATES DISTRICT JUDGE
